Good morning. I'd like to acknowledge the participation this morning of Judge Jose Linares from the United States District Court for the District of New Jersey, sitting here by designation of the Chief Justice. We appreciate his assistance. And I also have, take a minute here to make a motion. Judge Lurie, if I could step aside for a moment. I'd like to move the admission of my law clerks. I move the admissions of John Albert Fettet, who is a member of the Bar and Good Standing of the Highest Court of California. Ashley Boland-Sommer, who is a member of the Bar and Good Standing of the Highest Court of South Carolina. And Christopher Burrell, who is a member of the Bar and Good Standing of the Highest Court of Minnesota. I have knowledge of their credentials, and I am satisfied that they, in fact I am certain, that they possess the necessary qualifications. Judge Linares, do you have any dissenting view, having examined the record thoroughly? No, I do not. Well then, on the basis of all the representations that have been made and all the evidence presented, I will grant the motion. Would you please prepare to take the oath from the clerk of court? I do. Please raise your right hand. I swear or affirm that you will report yourself as an attorney, counsel to this court, uprightly and according to law, and that you will support the Constitution of the United States of America. Thank you. Congratulations, and welcome to the Bar of the United States Court of Appeals for Federal Service. Congratulations, gentlemen. We welcome you to the Bar. We wish you good luck and good fortune, and hope you have interesting cases, and look forward to seeing you here in the future. Thank you. The first case this morning is Nilsen v. Ostrom, Sylvania, Incorporated, 06-1550. Mr. Smith. May it please the Court. I thought I might begin by focusing on just two of the district court's inequitable conduct rulings, rulings that we think illustrate the severe problems with the entire decision below, and that are particularly important. The only two rulings that affect the 123 patent. That patent is particularly important itself because it covers one of Mr. Nilsen's most important inventions, the compact fluorescent lamp, which is currently sweeping the marketplace as an energy-saving alternative to the conventional light bulb. The two rulings affecting that patent that I would propose to talk about with your indulgence are the nondisclosure of the Motorola litigation, and the proper interpretation of the CFL agreement as to whether or not it created an obligation to license a large entity, triggering the obligation to pay large entity-level maintenance. Mr. Smith, you've got a number of patents here. In fact, we've got a very extensive, color-coded listing of all of them. That would be Mr. Seegee's unit. All right. In any event, it's a complicated case, and there are a number of grounds for holding of inequitable conduct, which causes an abuse of discretion standard of review. And the trial court did a pretty thorough job. Maybe you've got lawyers' answers to each of them, but the trial court sort of laid out credibility judgments and relevance and intent, and you've got a pretty steep hurdle to climb here. Your Honor, I do think it's important to take those one by one and see what the district court really ruled and whether it made any sense, because if you just read the opinion through, you think, well, there's an awful lot here. They threw it against the wall. It all stuck with this judge. Maybe we should just defer. But if you look at each of these holdings one by one, in many cases, there's clear errors of law with respect to materiality. And in other cases, there's absolutely no evidence of intent combined with a complete absence of any reason why anybody would try to withhold that information. The Motorola case, for example, was utterly harmless. Nothing whatever happened in the Motorola case that could conceivably have led to any different treatment of the patent applications that were pending. And that's essentially undisputed. Essentially, the argument here is a kind of per se rule of materiality based on the FPEP provision that says same subject matter. And we think that's probably the wrong reading of the provision, but it doesn't matter. Ultimately, the high materiality finding of the court can't possibly stand, because there's nothing that happened in the case. After the initial boilerplate reference to invalidity in the answer, the patent claims in that case weren't even litigated for the relevant three-year period. Which patent had the fewest grounds for inequitable conduct against it? Really, one of the ways why I'm focusing on the 123 is it's got the Motorola issue, and it's got the CFL issue, which is a pure issue of law about the interpretation of that contract. The court's held on that issue without explanation that the agreement created an obligation to license a large entity. But the contract on its face doesn't say that. It says, quite the contrary, that if certain conditions occur, which Mr. Nielsen had in his complete control, then there would be an obligation to license a large entity. And we have no explanation from the court, or from Osram, frankly. But doesn't that same agreement say Nielsen and Phillips agree that Nielsen will offer and Phillips will take a standard license? Yes, Your Honor. And that's the sentence that Osram likes to quote. But you'd have to read the two sentences together. They're right next to each other. The prior sentence says, Nielsen expects to offer CFL manufacturers a preferential running royalty rate. This is on page 16178 of the joint appendix. Under his CFL patents for a limited period starting in 1996. But I'm sorry, counsel, to interrupt. There was a second CFL agreement. Isn't that correct? They're right next to each other. They have the same language. Well, in the second CFL agreement, which was signed by the parties in December of 1995, Phillips has the option to terminate its license. Doesn't that somehow indicate that there was an obligation to license? And then it says if Nielsen has not licensed 10% to the competitors, et cetera, which seems to indicate an existing obligation, no? No, Your Honor. It says Phillips shall have the obligation, the right to terminate, if at some point he hasn't licensed a 10% competitor. It doesn't go to the question of whether the license is in effect now. And indeed, there's no language that could really be read as suggesting the license was in effect now or that there was a current obligation to license. And in fact, until he went out and licensed somebody else, there wasn't an obligation to license. And that, in fact, didn't occur for a full 80 years until 2004. The record is undisputed. So what it says is once this license comes into effect, Phillips can then back out if you haven't gotten a 10% competitor license. But the trigger was to license somebody, whether they're 10% or not. And that had to happen at some point. And it didn't happen for 80 years. So the key sentence is the first sentence and how that leads you into the second sentence. It's an issue of law here. You review the judgment of the district court de novo. The district court didn't analyze the language at all, didn't meaningfully deal with the fact that until there was a preferential running royalty rate established by negotiations with some other third party, there couldn't be a license with Phillips because there wasn't any royalty rate in existence to set the terms of the license. Is it that there can't be a license or that no royalties will be paid? It says that Nilsen will offer the standard license at that rate. But he can't offer that rate until it has been established by some negotiations and licensure with respect to somebody else. Provided that no royalties will be paid until Nilsen has licensed a competitor. The provisor relates to royalties, not to the license. Now, there's two different things here, whether there's the obligation to license that comes from negotiating with anybody, any third party. The royalties are only due once you've got a 10% competitor. So there's two different triggers. One leads to the existence of the license. One leads to the obligation to pay the royalties. But neither of them arises at the time of this agreement. And Mr. Nilsen had it within his complete unilateral control to avoid them ever arising that duty. So it's a non-vested obligation, I guess, is your argument. It's a non-vested obligation. Is there any case law that you have been able to cite that says that a non-vested obligation is not enough? There's no case law on this small entity issue one way or the other. There's precious little case law on small entities at all. But there's certainly no case that suggests that if you have the right to back out at your unilateral right, it's still an obligation to license. The only case that Osram came up with was a non-patent case, this Wells Fargo case. But that involved an obligation that would be triggered when the other party took some steps. It says the government was going to guarantee a loan agreement. And it said in the agreement words, if the lender and the borrower take certain prerequisite steps, the government's obligation to guarantee would be triggered. In that situation, it's not vested yet. But the government certainly doesn't have the unilateral control to back out. So you're, in effect, pulling in your horns and retreating from what was a fairly widespread broadcast appeal, retreating into the 123 patent. No, Your Honor, I'm up here with 15 minutes to argue about 11,000 different things. So I thought I would focus on that. Because those seem to us very clear ones which are monumentally important because of a particular patent issue. The brief had been focused on that instead of covering the whole territory. It might have been a little easier to accept his view. Well, I appreciate that, Your Honor. But the truth of the matter is I think that many of the other rulings in this report are equally wrong. And wrong is a matter of law. For example, the notion that by merely listing parent applications in your application, you have created connected-law conduct. That's flatly contrary to the rule of law that prevails in this circuit under the Boringer case, which said flat out, unless you affirmatively try to mislead the patent examiner to think that you have an earlier effective filing date, the fact that you've listed a parent or a grandparent in your application simply is not connected-law conduct as a matter of law. That's what the court held in the Purdue-Farmer v. Boringer case. We're talking about the 1978 priority date now? Yes, Your Honor. Wasn't that what your client, Bill, claimed in the litigation in this case and asked us in interrogatory? Ten years later, when the lawyers went back and looked at the patents, somebody made a mistake in filling out an interrogatory answer, which was later corrected and then it was shown in a deposition. The key is whether or not anybody claimed an effective filing date in the prosecution of the patents. And he was continuously shown prior art that came after 1978, and he never said, that's irrelevant, I have a 1978 priority date. Instead, what he did was continuously distinguish all that prior art as not applicable to his invention on the merits. So he never- In other words, he recited the prior applications but didn't, in effect, claim priority. Right. And that's what the Purdue-Farmer case says is the trigger for any kind of claim of inequitable conduct in this area. Until you do something with that, you're allowed to put whatever kind of listing of parents you wanted in your application. And the NPEP says precisely the same thing. If I might refer- But of course, if you're not entitled to the earlier dates, then it's a fact question as to whether there was an intent to mislead. But you don't get there, Your Honor, because it's not material to begin with. That's what the Boringer case says, a matter of law. And the NPEP on page 14658 of the Joint Appendix says, the inclusion of parent or prior application information in the heading does not necessarily indicate that the claims are entitled to the benefit of the earlier filing date. So merely putting them in there doesn't tell the patent office anything, and they don't treat it that way. And so that's why they kept showing him his prior art from much later than 1978. And he responded by saying, it's not the right prior art, it doesn't fit my invention. In other words, he didn't say, it's not a valid reference because I'm entitled to an earlier date. That's absolutely right, Your Honor. So one thing I want to go back to was your comment that I was trimming my sails. I think that there's at least four basic- I said pulling in your horns. Whatever. They're a metaphor, I'm sure. Depends upon what sport you like. I mean, we've already talked about the motor roller problem, which was a completely harmless nondisclosure. We've talked about the CFL agreement, which was misinterpreted as a matter of law. We've talked about the Borenger case, which as a matter of law means that he didn't commit inequitable conduct with respect to that. Listing of the parent and grandparents. And then the fourth issue has to do with whether or not there's sufficient evidence of intent with regard to his reliance on the nonprofit status of the GEO Foundation during the period 2000 to 2005. And as to that, the district court held, well, I don't think GEO is a valid nonprofit. But there was no evidence of any kind submitted from Osram's side to suggest that. There was testimony from a lawyer who set it up and maintained it that it was a valid nonprofit. There was no law cited to suggest that under tax laws it wasn't a valid nonprofit. So what you have is a holding that's entirely unsupported by law or facts on that issue. The next question, then, is, well, assume it was a valid nonprofit and Mr. Nilsen thought so. What about this mistake he made in reading the regulations and the NPEP as saying that if a license is coming from a nonprofit, even when it goes to a large entity, it is still subject to the small entity rules? The plain fact of the matter is that's what the NPEP and the regulations said in 2000. They said the exception for licensing large entities by small entities was put in the definition of independent inventor, but it was omitted in the definition of nonprofits. And so he read the rule. He came to the conclusion that that makes sense. That seems to be a special deal for nonprofits. I don't have to pay the large entity fee now that I'm licensing to a nonprofit. And he acted in accordance with that for a period of five years. And there's absolutely no evidence in the record to suggest that that wasn't what happened. You're under rebuttal. Do you want to save it? Your Honor, unless there's further questions right now from anybody, I would save it. Thank you. Thank you for your consideration. Is it Mr. Seave or Seavey? Seavey. May it please the Court. Your Honor, I'd like to start by answering Judge Lori's question as to which of the patents had the fewest grounds. And the answer to your question, Your Honor, was the 270 patent. That one had one ground for inequitable conduct, and that was the improper small entity payment. The 123 that Mr. Smith referred to actually had two grounds. That was the improper small entity payment and the failure to disclose the mobile roll litigation. Your Honor, the judgment below should be affirmed here because the district court did not abuse its discretion in ruling that Mr. Nilsen committed inequitable conduct. The district court held that Mr. Nilsen engaged in a pervasive pattern of inequitable conduct over the course of a decade, and frankly, in creating a tangled web of patent applications that we prepared, in order to both obtain and maintain the patents in suit. Now, by its very nature— But where was the evidence of intent with respect to any of these? The judge used the word, but where is the actual evidence of intent? Your Honor, let me address that in two ways. Particularly with respect to 123 and the 270 patent. Your Honor, with respect to the small entity payments, the district court outlined a whole series of evidence of intent, and I would suggest that the court's evidence of intent on any one of the four grounds is individually sufficient to affirm the judgment. But first of all, it's sort of absurd, given the value of these inventions and all the money, for him to play nickels and dimes with small entity payments on a couple of these patents. Secondly, the rules changed in the PTO. Isn't that right? Well, Your Honor, I don't think the rules ever changed. What changed was the NPEP guidance as to whether or not a nonprofit that had license to a large entity, they made that express. But Mr. Nilsen's own expert admitted during the trial that the rules were always clear, that if you read the CFR and you read the NPEP, there was never any dispute that, in fact, a nonprofit that had license to a large entity was not entitled to pay small entity payments. Mr. Nilsen's own expert admitted that during my cross-examination. Once again, where's the evidence of intent that he deliberately tried to get the benefit of something that he knew he wasn't entitled to? Well, let me summarize that, if I could, Your Honor. Mr. Nilsen admitted that he understood the distinction between large and small entity payments. That's at 489 of the transcript. He admitted that he read the NPEP section that incorporated the relevant CFR provisions. He even sent a note to the PTO talking about the requirements for small entity status. So he clearly understood what he was doing. He admits that he read and understood the PTO form that he was required to sign, in which he had to check off a box swearing under oath that he understood what he had to do to obtain small entity status. He admits, and this is at page 491 of the transcript, he said, quote, they make it pretty easy. They direct me to read these paragraphs in the CFR. Now, the district court heard that testimony and obviously concluded that Mr. Nilsen fully understood the CFR rules and that his bald denial on the stand after the fact was not credible. In addition to that, the district court cited the fact that he was a self-proclaimed expert in prosecuting patents and the sheer number of improper filings itself suggest intent. For example, in the Daimler-Preisler case, which we cited, the court in that case found seven different small entity payments over the course of seven years. But here, we have in excess of 27 small entity payments over the course of 10 years. But that goes to his understanding of the nonprofit status and whether or not they were entitled to the small entity payments.  He goes back to whether he was reasonable in his belief that a non—that GEO, I guess is how you pronounce it, nonprofit status allowed him to make small entity payments, right? And whether or not his belief was reasonable. And then you have to go into—and shouldn't the district court, in analyzing the intent, look at the totality of the circumstances and say, well, he had been paying regular payments up to the time he transferred it, with the exception of maybe one, right, up to the time he transferred it to the nonprofit. It is then that he started paying the small entity payments. And when one looks at that, coupled with the changes in the manual, coupled with the point that was made by my colleague here that he was risking millions of dollars versus saving $45,000, when one looks at the totality of the circumstances, why isn't then a finding of intent clearly erroneous? Your Honor, if I could correct a couple of factual statements that you made. First, the rule was changed in 2001. That is not the rule, the NPEP. The NPEP. Prior to that time, Mr. Nielsen made six small entity payments that were improper. He had no explanation for those. So he made six improper small entity payments during the time when he was claiming that he thought he was entitled to the benefit of the rule. After the rule was changed in 2001, Mr. Nielsen claimed, I suddenly never read that. Even though the rule was changed to my detriment, I suddenly didn't understand that. And the district court said that was not credible. The court said, I don't believe that Mr. Nielsen read the rules and took advantage of one that he thought he was entitled to. But when the rule was suddenly clarified to make it clear that after 2001 he could no longer claim small entity payments, that he suddenly didn't do that. And what the court found was that there were ten improper small entity payments, even after the rule was clarified. Even after the NPE was clarified. So here's a situation in which Mr. Nielsen is claiming that he suddenly was unaware of a rule that was changed to his detriment. And the district court said, I don't find that credible. To answer Judge Lori's question about why would someone do this, Your Honor, I can only speculate as to what goes through Mr. Nielsen's mind. But I would make two points on this. One, it is undisputed that Mr. Nielsen is a unique gentleman who opposes, it's undisputed, opposes fees, taxes in the present legal system. And the district court cited that evidence as a motive to underpay. Because he paid. Well, he underpaid. Yeah, but he paid a fee. It's not like he said, I'm not paying a fee. Right, but secondly, to answer Your Honor's question, it wasn't just the $45,000 that he saved with respect to the 11 patents in suit. The evidence, it was over $220,000 just for the ones that were licensed to Phillips. Those are the ones that are not in suit, right, the $200,000 that he withdrew. Well, what we did was we looked at his entire portfolio. And Mr. Nielsen acknowledged that it would have been over $200,000. My recollection is that it would have been over $225,000. What about the issue of damages that is addressed by Mr. Nielsen here, which his point being that if I pay the correct fees for X number of years and then erroneously made a small entity payment 8 years down the line, 10 years down the line, that I should still be entitled to the damages for infringement from the date that I prosecuted, properly prosecuted my patent up to the time I made the small entity payment? Well, Your Honor, I would have two responses to that. First, that's an issue that was not raised below and was waived. But secondly, that is not an argument that I think this Court should give any weight to. If you think about the perverse policy incentives that that would create, it would be a terrible rule of law. And in fact, this Court has repeatedly held that when a patentee commits inequitable conduct with respect to some of the claims in the patents but not all of them, that all of the claims, even the ones that are untainted, In the prosecution of the patent. In the prosecution. This is not in the prosecution of the patent. This is a maintenance fee down the line. Right, but in the Uleague case, this Court found that the inequitable conduct principles apply equally in the payment of maintenance fees because there is a policy that we want to encourage patentees and applicants to square fair deal and square dealing with the patent office even after the application. And if I could give Your Honor an example. Assume, for example, that a patentee is facing the very last four-year maintenance payment. And the patentee makes a decision that I'm going to intentionally underpay because the worst thing that can happen if I get caught is I'll lose the last four years of damages. Do we really want to be creating a rule or a situation where we're encouraging people to game the system? We want them to be paying the right fees all the time. And what the courts have repeatedly held is that if there's any doubt at all about whether or not you're entitled to small entity status, you're supposed to pay the large entity fees. And, in fact, the courts have held that there's an affirmative duty on the patentee to make sure they investigate fully the circumstances under which they are paying their small entity fees and that if there's any doubt, they're supposed to pay the proper fees. How about the other issues? Your Honor, let me address, if I could, the priority of this claim issue that Mr. Smith raised with respect to the Bowringer case. The Bowringer case, which they rely on heavily in their brief, I would argue is completely inapplicable for this reason. In Bowringer, the patentee complied fully with Section 120. There was no dispute in that case that the priority data and the priority claims back were in full compliance with Section 120. But, look, if you've got a series of applications and you've got some basis for claiming some priority and you've got CIP, which by definition means that some of it carries over, where is the inequitable conduct in just reciting that this is a CIP and it's continuation or whatever and never arguing that the cited reference is removed as a reference because I predate it because I have a prior application to which I'm entitled? Your Honor, the inequitable conduct, I would argue, arises in several respects. First, Mr. Nilsen filed false declarations with the examiner in which he claimed that he was in compliance with 120 and that all of the intervening applications had a proper cross-reference and a proper co-patency. Those false representations and declarations are themselves material. Second, Mr. Nilsen You're talking about declarations on filing subsequent applications? Right. When he filed that application, he made a false statement to the examiner. He said all of the intervening applications are in compliance with 120. That was false on its face. You state that and then don't you state in a declaration that some of the subject matter has been prior described? Right. But he's representing to the examiner that his application is in full compliance with the Section 120 cross-reference and co-patency. That doesn't mean everything in the application is in the prior application. No, but I believe what Mr. Nilsen clearly is representing is that those intervening applications he may not be claiming priority for a particular claim back. He's at least representing that the intervening applications are in compliance with 120. And I think Your Honor needs to consider the materiality of this issue in the context of what Mr. Nilsen did. I would argue that Mr. Nilsen's letters to advance that we cited in the record themselves show that Mr. Nilsen believed it was material. Because what Mr. Nilsen was doing here was trying to create a situation where he could solve what he thought were prior art problems in his application chain. In other words, for 8 years, between 1984 and 1992, Mr. Nilsen claimed priority only back to the 1984 application. And that's important because Mr. Nilsen admitted on the stand that his practice at the time was to claim priority as far back in the chain as he could go. So we know at the time that he only thought he could go back to 1984. But then, what did the two advance letters show? They show that he recognized he had potential prior art problems. But didn't he, when he had a reference cited against him, didn't he not say, I'm entitled to an earlier priority? Didn't he just argue the irrelevance of the reference on its merits, not on dates? I think there was one situation in which he did that, Your Honor, but we also pointed out in the briefs. You say that's the exception that proves the rule? Yes. In the 692 application, for example, as we pointed out in our briefs, Mr. Nilsen did try to use the 1978 priority date to argue around a prior art reference that was cited by the examiner. And perhaps most important, what Mr. Nilsen did was he gave himself an ace in the hole. He left himself the opportunity to argue back whenever he needed to. And the best example, Judge Meyers, is when he claimed that he was entitled to 1978 priority dates in this litigation. That shows that Mr. Nilsen, when he wanted to get back to 1978 to avoid prior art, knew how to do it and that he would use the 1978 priority dates to his advantage. Your Honor, the other point I wanted to make about the priority claims is that it potentially gave Mr. Nilsen the ability to argue around his own patents. If you look at the advance letters, what they show is that Mr. Nilsen at the time was clearly concerned about the fact that his own patents could be cited as prior art against him. So to solve that problem, by claiming a chain of priority all the way back to 1978, he's able to wipe out all those prior patents, or at least make arguments on those, and therefore he doesn't have to worry about them as prior art. I would argue that the priority misclaim is a unique situation in this respect. This Court has repeatedly said that direct evidence of intent is rare. But here you have a situation where we have two contemporaneous letters that are themselves direct evidence of intent. They show that Mr. Nilsen knew what he was doing and that he intentionally tried to claim back. So on the intent score, this may be the best example of where the District Court fully got it right, relying on the direct evidence of intent and not just having to rely on the inferences that may exist in other cases where you don't have those contemporaneous letters. Your Honor, let me make this final point if I could. The District Court found that Mr. Nilsen engaged in four different types of inequitable conduct. Any one of those on their face are sufficient to affirm the judgment. And of course, this Court reviews the judgments, not just the opinion. Taken collectively, what the District Court found was that Mr. Nilsen not only wasn't credible, but that he had engaged in an extensive pattern of fraud, of misconduct, of inequitable conduct over the course of ten years. And he did that after a six-day bench trial. And he did that after Mr. Nilsen's counsel in his opening statement specifically asked the District Court judge to look Mr. Nilsen in the eye, assess his credibility, and to make a determination as to whether he was believable. That's what the District Court did. And on this record, I would suggest there was no abuse of discretion and the judgment should be affirmed. Thank you. All right. Thank you. Mr. Schmidt. Thank you, Your Honor. Let me just, as a housekeeping matter, first, there was some suggestion in the brief by Osram that we had waived the argument that the 123 patent was only covered by the CFL agreement and not the Phillips agreement. I will refer the Court to paragraph 169 of the proposed findings of fact, where we clearly stated the 123 is a CFL patent subject to that legal argument. Now, I want to respond to the notion that Mr. Nilsen got something he didn't deserve by committing fraud in the patent office here. Whatever else you can say about what happened here, it's not as if he got some patent protection he didn't deserve. The Motorola case was obviously harmless. The priority misclaims, as they call it, were never invoked. Like in any of the patents in suit, the suggestion that there was an invocation of a priority date was a reference to a patent application not involved in this litigation. And he had dozens of opportunities with signing our briefs where he could have invoked the 1978 priority date, and he didn't. The Borenger case was characterized by Mr. Seiby as a case where 120 was complied with. There was a 120 violation in that case. They had new claims that were not supported by the old disclosures, so they weren't entitled to the old priority date, but they nevertheless listed it as apparent. It was exactly a comparable situation. It's a different 120 problem, but it was the same situation. Again, a court held as a matter of law, no inequitable conduct. Now, I do think I should respond, and this is a problem with the district court opinion exhibited as well, to this notion that because you both believe in the progressive income tax, you can somehow infer the intent to not pay fees to the patent office. That's essentially all that was ever shown about Mr. Nilsen, is that he's a libertarian who thinks that the rich shouldn't have to pay money to help the poor. That's his political philosophy. He's entitled to have that philosophy in this country, but to suggest that you infer from that that he doesn't believe in paying the fees he owes for the patent protection, which he spent his whole life working to develop for himself. He owns 250 patents. It's a non-secondary, Your Honors, and I just think it's sort of unfortunate that you get that kind of political philosophy being brought into a case like this, the suggestion that somebody can't have those beliefs and still be financially honest. The problem is he came before the district court, and he testified on all these issues, and he wasn't believed. Your Honor, if you look at those findings one after the next, what's missing is any reference to any reason why he wasn't believed. It's evident that the district court didn't find him to be a credible witness, but I think you need in a case where you require clear and convincing evidence, the burden of proof is on them, more than simply the judge saying, I don't like that guy, I don't believe him. First of all, not believing our guy is not affirmative evidence to support their claim. They had the obligation to produce the evidence. We did not. Thank you, Your Honor. Thank you. The case is submitted.